Before we begin, Judge Rudman, I'd like to say that we are delighted, very delighted, to have sitting with us Judge Angaro from the Southern District of Florida. She's an old friend and has sat with the Court before. We'll begin with the first case, United States v. Burk. Mr. Hall. Good morning, Judges. My name is William D. Hall and I represent the appellant Shirley Burk. Ms. Burk was convicted of count one in the indictment, a conspiracy to commit the overt act of arson, the overt act of false statements to a court, and the She was charged in that count with nine different overt acts and the jury found her not guilty of the three of them. Based on the evidence and the rulings of the court and the jury, we raised one issue, whether there was sufficient evidence to find that she was guilty of the years, starting in 1997 and continuing on through 2008. There was a total of six fires over the period of that time. The first fire occurred at 410 Oak Street in Thomasville, Georgia, which that's in Thomas County. The property was owned by the co-defendant, Elbert Burk. It was, Shirley Burk was a tenant at that time and the fire was damaged, damaged the property in November. I'm sorry, let me back up. That is the second fire. I apologize. That's the second fire. And Ms. Burk did receive remuneration from that fire of $5,000 and some dollars. The evidence was presented in court and it was intentionally set. However, there was no evidence whatsoever that Ms. Burk set the evidence, set the fire. There was no evidence that she knew the fire had been set. In fact, there was no evidence of who set the fire. I'll let you back up to the first fire. And that's the 97 fire. And that was at Vaughnville Drive in Cairo, Georgia. And it's actually, this place was burned about three times. And during that time, Ms. Burk had nothing to do with the 97 fire. She was not a tenant and she was not an owner. The first fire was in 2002 and that was also Vaughnville, Vaughnville fire. It was determined to be intentionally set. The investigator said it's set in the attic. Again, nothing about Ms. Burk comes into the fire and nothing that she intentionally knew of the fire. She must have incredibly bad luck. I mean, she was living at a place three different times when intentional fires were set, twice in the same place. I'll agree with that, Judge. But what I want to really skip to then is the government's contention is that she intentionally was involved in the Survivor Act because she knew the fires were intentionally set. But I guess my question for you then is, and I think a jury could have decided the way you're suggesting, but I think a reasonable jury looking at this evidence was within its to find that she was involved in the conspiracy, particularly considering her involvement with the documents and other things. If she was a normal person, I would agree with that. But our defense to the jury was she had the mental capacity of almost an eighth-grade person. Her education level was third grade. She was, IQ was 47. That's at a lower 0.10% of the population. That means 99% of the population has a better mental capacity than her. My argument to you and to the whole panel, she didn't know or couldn't understand what Elbert Burk was doing burning these places. She was a victim and she was taken advantage of. I suspect that's what you told the jury. Sir? I guess that's what the jury heard. Yes, sir. The judge heard that and the jury heard that. I understand that they had a way to find her guilty saying, I don't believe that maybe. But there was no contradicted evidence of her mental capacity. None at all. The government presented nothing that said that she does not have this kind of, that has the capacity to commit this act. It was uncontroverted what our experts said about her. And I think almost a matter of law, there's no one in that mental capacity could have committed the intentional conspiracy. I doubt she even knew what a conspiracy was. I'm going to go outside the record. When I interviewed her, I was talking to her about a check she received and it was a counterfeit check. And I asked her, I said, Ms. Burk, tell me about this counterfeit check. And she was silent for one minute. And she looked at me and she said, Mr. Hall, what does the word counterfeit mean? And at that point, I said, we better have her evaluated. And we did have her evaluated. And the expert found and testified. Her mental capacity was just not there. That's the bottom line. And there's no way she could be involved in these three conspiracies, this conspiracy to commit the arson. The other two, the mail fraud and the false statement, there was conflicting evidence to those charges. I looked at that, but there was question to fact. I said, that belongs to the jury. They made a decision on that. And I just don't believe in throwing stuff up against the wall and see if it'll stick. And so I brought the one issue I thought there was really no evidence to find her guilty of. And that was conspiracy to commit overt act of arson. Thank you, Mr. Hall. You're safe for a little while more time. Mr. Kouhelis. Good morning. May it please the Court. Christopher Kouhelis on behalf of Daryl Burke. Our contentions are obviously laid out in the brief. But overall, I want to express this to the Court. This was an overly broadly alleged conspiracy, which sought to then bring into the artful pleadings disparate occurrences that then brought in my client. If you look at the overt acts that are alleged in the indictment, there are four overt acts that are actually alleged with respect to my client. They occur over the course of four months. He then is brought into a conspiracy that allegedly lasted for, I think, 14 years by the time it reached trial. That behavior in four months. And I, in particular, want to turn the Court's attention to the way that this was pled as opposed to what was actually proven at trial. The scheme, according to the indictment, was that the co-conspirators devised a scheme to defraud, wherein Elbert Walker or others acting at his directions purchased a residence with a value of less than $100,000. The owner incurs certain debts, which may result in property in question. In order to have this debt forgiven and retain possession of the residence, the owner files a bankruptcy petition and falsely claims that his or her primary residence is the newly purchased residence when he or she truly lives elsewhere. And it goes on in this scheme describing this complex series of qualifying a straw purchaser, burning a home, setting up false debts. My client was largely convicted based upon a trailer fire that happened in southwest Georgia. There was no mortgage. There was no debt. There was no loan. There was no proof that either my client or that Mr. Walker actually set the trailer on fire. In fact, the evidence, even the overt acts, which constitutes the majority of the evidence relied upon by the government at trial, was not even as alleged in the indictment. They stated that he purchased the trailer for $1,200. The evidence that was established at trial was that Walker purchased the trailer for $1,200. Did any purchase an SGE stamp that was used in furtherance of the fraud? Yes. My client did purchase a stamp, and we would submit respectfully to the court that that act does not evidence knowledge of the broader conspiracy. And we submit that it's much like in Chandler, someone being used to present a fraudulently obtained sweepstakes. But isn't that for the jury to decide? I think that that is a fair issue for the jury to decide, Your Honor. But what I would also say, in the context of this case, where we were in trial for a month . . . The stamp became a big deal, didn't it? It did become a big deal, Your Honor, especially . . . The stamp deal. One, he bought it for the club. One, he bought it for Newman or whatever his name was. And the third one, he didn't buy it at all. So he knew what the significance of the stamp was. I think that's an inference that can be made. I also think that our presentation of argument relating to that was severely tainted by the fact that you have a special agent who knows better and who purposely raises the ire of the polygraph examination during his testimony. But isn't there another dimension to the relationship of Daryl Burke to Walker? Because he works for Walker. He works in this renovation company. And the renovation company is supplying the insurance companies with repair estimates in order to support the claims. And that's a lengthy relationship, right? How long does that last? Your Honor, what I would submit is you have to view this through the cultural focus of Southwest Georgia. I am not familiar with that. This is his cousin. And he was working with his cousin. We use the word company all we want to. I think that makes them closer. But, you know, working for your cousin and getting a paycheck from him does not demonstrate that he knew that Northside Home was an ongoing criminal enterprise. But then in 2007, there's a search warrant executed at his place. And it does seem peculiar some of the documents that are found there. I mean, for example, why would he have business cards for Farrell Witten, who handled Shirley's insurance claim after the 2002 Bonvilla fire? Or Richard Wallace's business card, who handled Dixon's insurance claim after the 1997 Bonvilla fire? What is, I mean, wasn't a jury entitled to draw an inference from that that he was involved in this conspiracy in an ongoing way? I think that that is certainly a fair argument, Your Honor. I would submit no. I would say, one, it's his sister. And these are poor people who are in and out of each other's houses all the time. And to a certain extent, you have to just understand these folks. Also, you have to look at the fact that you have a special agent, Sprouse, who literally presented false testimony about where the documents came from. He literally had to recant his testimony on the stand. We had no independent way of being able to tell which document came from where. And during trial, I mean, it was a huge moment in the courtroom to see and to establish that he had to admit that his testimony about intimate documents being at one house versus another was actually false. And so I submit to the court respectfully, in a case where the evidence of my client's participation in an overall conspiracy largely consisted of legal acts, purely legal acts. And when the evidence, what little evidence is admitted, ends up being tainted by reference to a polygraph examination. We submit some of the evidence was obtained during a custodial interrogation. And then the evidence of Benjamin Norwood and his conviction for arson, which there can be no more damning evidence in a conspiracy case where the jury is literally instructed that each conspirator is liable for the actions of another. When an unindicted co-conspirator's evidence of his prior conviction for arson is admitted, I submit to the court. Well, but was it actually admitted? Wasn't it the case that the judge gave a curative instruction saying there's no evidence of any kind of conviction of Norwood for arson? We don't contend otherwise. But it was a bail that could not be unwronged. Thank you. Yes, we've saved two minutes for rebuttal. Ms. Schreiber. May it please the court, Michelle Schreiber for the United States. The jury got it right. In this case, when it convicted Daryl Burke of conspiracy to commit mail fraud and Shirley Burke of conspiracy to commit mail fraud, arson and false declarations before court. And the district court got it right when it denied both Shirley and Daryl Burke's motions for judgment of acquittal. The evidence was sufficient to show that Daryl Burke and Shirley Burke in conjunction with Albert Walker, whom I understand to be their uncle, not a cousin, not that it matters significantly, agreed to accomplish a common scheme to buy low-cost properties, take out insurance on these properties, damage and destroy those properties by arson and then submit the claims for the losses. And when the insurance companies didn't pay, Albert Walker and Shirley Burke would pursue the insurance companies in court. I can tell by the court's questions that you're very familiar with the facts and you understand that, for example, when it came to Daryl Burke, that he very much was involved in the property at Beggs Ferry Road where Albert Walker bought the trailer for $1,200 from Cary White, but Daryl Burke took out the insurance on the property, claimed that it was worth $6,500 and when the fire occurred, took $10,000 on that property. And that is very significant evidence of his knowledge and involvement in the conspiracy. And at the same time, Tamika McIntyre, who's actually living at the trailers, making payments to Albert Walker. And so there was a lot of inter- co-dependence on these people that came through in the evidence and that the jury viewed and understood. And even more so with regard to Shirley Burke who was involved in, as you pointed out, three suspicious fires leading to beyond the possibility of mere coincidence. And her knowledge, her denial of previous losses in her insurance claims, her pursuing these losses, knowing very full well that she did not have a right to the insurance was solid evidence of her involvement in the arson, the mail fraud, and all of the declarations before the court, which was fully supported by the evidence. I see the court has no questions. And I know that, I can tell that you're very familiar with the facts, so there's no point in me continuing to point these out. We would simply ask that, if the court has no questions, I will return my time to the court and simply ask that the convictions be affirmed in this case. Thank you. Mr. Hall. Judges, I'd like to respond to the government's rebuttal by, yes, Albert Walker was the father of Shirley Burke tremendously. She was his niece, not only a family member, but someone of her mental state. Counsel for the government said she knew full well, or knowing full well, that is not true. She had a 40 IQ. There was testimony that she was easily confused, easily led along to the Primrose Path. And intentionally setting a fire doesn't make you, if it's intentionally set, that doesn't mean it's a bad influence came. Somebody burns my house intentionally, if I didn't burn it and I don't know who burned it, my insurance company is going to pay for it. You know, an IQ of 40 is a really dramatic fact, but there was no pretrial effort to have her found incompetent? Yes, ma'am. We had a full-blown hearing. But there's no issue on appeal about that. I mean, 40 is low. We changed our strategy a little bit from the competency to the strictly capacity to form the intent to be involved with the conspiracy. We had a lot of sidebar on that, and I think you would see that in the transcript. And we argued to the jury and to the judge that she just did not have the intellectual capacity to be involved in this conspiracy, especially the arson. You didn't plead an insanity defense? No, we did not say that she didn't know the difference between right and wrong. We completely eliminated that off the start. That was not part of our defense. It went down to that narrow . . . So the jury heard the evidence on the point? I'm sorry? So what happened is the jury heard the evidence on the point? They heard the point. We couldn't title it that she was insane knowing the difference. No, I understand. Your argument was she didn't know what she was doing. She didn't have . . . She's a criminal. Yes, sir. She did not know that Elbert Walker was having these fires intentionally set, and she was involved with that. She didn't know who it was intentionally set. And look at the space of time, 97 all the way out to 2008. That's a long period of time for a person who's easily confused and doesn't understand what's going on in any kind of legal . . . a real estate contract or an insurance contract. She signed some contracts. They were submitted in. The evidence was she didn't even read them. They were filled out by somebody else, and she just signed them. Now, I know you own what you signed, but at the same time, there is no way that Ms. Burke had the capacity to understand the conspiracy that was going on with Elbert Walker, especially about the fires. There was just too much time and space in between those acts. I think we understand your point. Thank you. Briefly, in rebuttal, thank you, Your Honors. Turning back to the issue of the evidence and the overt acts which were alleged in this case, the variance between what was alleged and what was proven, respectfully, we submit as fatal. And it was borne out, I think, by undisputed facts. The purchase of the trailer, it was established by the government. It was purchased by Elbert Walker. Certainly, his relationship is something that the jury could absolutely take into consideration. I don't dispute that issue. He made application for insurance coverage and that he falsely stated the purchase price for the trailer was $6,500. No evidence was ever presented that my client purchased it. There's no way of telling whether or not there was an intervening transaction that occurred in the meantime. Separately, the testimony from the insurance agent was that she actually went out and visualized the property, that she filled it out, and that they had an express form in order for this type of interest to be insured. She actually viewed it, submitted it to the insurance company. It went through underwriting. That he made a fraudulent claim for insurance proceeds. The evidence was that he literally reported that it was a fire of suspicious origin. So I submit that under the larger context of the case law that the court has before it on the danger of establishing a conviction, especially one that isn't this broad of a conspiracy that's alleged, based upon purely legal acts. And I then ask the court to look at what evidence that was obtained and presented concerning my client and the taint that resulted from the cumulative effect of the polygraph mentioned, the conviction of Benjamin Norwood and the custodial interrogation. I think we have your case. Thank you. Gentlemen, you were both court appointed to represent the two appellants and we deeply appreciate your having taken the assignment. We'll go to the next case.